EDWARD S. BLACK et al., appellants,

*v.*

HENRY FOLJAMBE, respondent.

1. The testimony in the case was held to establish, clearly, the capacity of the testator to make a will.

2. That a wife requests her husband to appoint her one of the executors of his will, is not evidence of fraud or undue influence; nor the fact that the wife's sisters, one of whom testator was visiting, procured the attendance of the lawyer of one of them to assist testator's lawyer in drawing the disputed will.

Appeal from decree of Morris orphans court.

*Mr. J. B. Vreeland* and *Mr. H. C. Pitney,* for appellants.

*Mr. W. G. Cumming,* for respondent.

THE ORDINARY.

This appeal brings up for review a decree of the orphans court of Morris county, refusing to admit to probate a writing purporting to be the last will and testament of George Brown, deceased. The will was executed on January 8th, 1883, at the house of Mrs. Noe, a widow, and sister of the testator's wife, in Madison, in the county of Morris, at which house the testator then lay sick. It was drawn and signed on Monday, and he died on the following Wednesday. He was about seventy or seventy-one years old, and had been sick for a considerable length of time. He had made a will, drawn for him by Edward S. Black, Esq., a counselor-at-law of Newark, in June, 1882. In November following, he gave directions to Mr. Black for a codicil to it, revoking the legacies therein given to Lizzie Whitfield and Robert L. Whitfield. Though the codicil was drawn, it was not executed. The will in question was drawn by Charles A. Muir, Esq., a lawyer practicing in Morristown, aided by Mr. Black. It is very simple. It directs that

the testator's debts and funeral expenses be paid, and then gives
to the testator's wife all his property, both real and personal,
wheresoever situated, and whatever the same may be, to her
and her heirs and assigns forever, and adds that it is the testa-
tor's will that none of his real estate shall be sold until five years
shall have elapsed from the date of his decease. It then appoints
Mr. Black and the testator's wife executors, and then gives to
Lizzie Jones, the testator's adopted daughter, $10. The caveator
insists that the testator was incompetent to make a will when
that will was made, and that the will was the result of undue
influence on the part of his wife and her family. The testator
was a man of intelligence and firm character. He was, by pro-
fession, a Methodist preacher, but in the latter part of his life he
was engaged in the business of fire insurance. He was president
of the Humboldt Insurance Company of Newark. He had no
children, nor any descendants. He was married twice. His
marriage to his last wife took place in 1878. He was then
sixty-five or sixty-six years old, and she twenty-two. By the
before-mentioned will of June, 1882, drawn by Mr. Black, he
provided for her by giving to her all his household furniture,
books, pictures, works of art, fuel, housekeeping provisions and
other consumable stores in or about his dwelling-house in New-
ark, and then placed the residue of his property in the hands of
his executors, in trust, for twenty years from his death, giving to
George B. Whitfield, out of the income, $50 a year until his
majority, and to the testator's wife, $300 a year until the end of
the twenty years, if she should live so long, and directed that
the balance of the income be used in paying off encumbrances on
the property. And he provided that if his wife should be alive
at the end of the twenty years, the principal, after paying out
of it $1,500 given in legacies to George B., Lizzie and Robert
L. Whitfield, if they should be alive, should go to her. The
will provided also that in case Mrs. Brown should refuse to ac-
cept the provision therein made for her, his household furniture,
books, pictures and works of art should be converted, as soon as
practicable after his death, into cash, and that the $300 a year
given by the will to her (on condition of accepting the provision)

Black *v.* Foljambe.

be used to pay off the encumbrances of his real property, and that at the end of the twenty years, the real and personal property be converted into cash, and after paying the legacies to the Whitfields, if alive, the balance go to certain charitable associations. It appears that in the latter part of November, 1882, he, as before stated, gave directions to Mr. Black to draw a codicil to that will, revoking the gifts therein to Lizzie and Robert L. Whitfield. He represented to Mr. Black (according to the recollection of the latter) that Lizzie Whitfield was dead, and Robert L. Whitfield insane. In fact, Lizzie was not dead, and Robert was not insane. Lizzie's husband was insane. The testator had made a will previously to that just mentioned, in which he had made like provision for his wife.

The will in question was executed with all due legal formalities, and the testator appears to have been possessed of the requisite mental capacity. I do not regard the fact that in September or October, 1882, he signed his wife's name with his own to a deed for a piece of property he owned in East Newark, as an evidence of insanity. The property was not of very great value. The consideration of the conveyance was $600. The testator was in Newark, and his wife, at the time, in Madison. He gave as his reason for signing her name that she would be willing to sign the deed and he did not want to trouble her about the matter. She did, in fact, sign the deed afterwards, without any objection whatever.

It is urged that when he directed Mr. Black to draw the codicil he was under a delusion as to Lizzie and Robert L. Whitfield. As before stated, the husband of the former was insane and she was alive, and Robert was not insane. Mr. Black says the reason given for revoking the legacies, according to his recollection, was that Lizzie Whitfield was dead and Robert L. Whitfield insane. But the reason for the change was a matter of no concern to him. To him the important part of Mr. Brown's communication was the direction to revoke. Mr. Black was not interested in the reason, and his recollection may be at fault in reference to it.

The proof is that, when the will in suit was made, the testa-

Black v. Foljambe.

tor's mind was unimpaired. He transacted business almost up to the day of his death. Mr. Williams, who was his partner in business, testifies that the testator settled his affairs with the Humboldt Insurance Company about the 1st of December, 1882, which was only about a month before his death, and that he received letters from the testator during his last sickness, the last one only about four days before his death. It was written by his wife but dictated by him. At the same time the testator sent two checks drawn on the bank in which he kept his account, one for the amount of his indebtedness to an individual, and the other for what he owed to an insurance company. They were correctly drawn, on the right bank, for the right amount, and to the right persons. Other witnesses testify to his competency. Dr. Van Wagner, who attended him in his last days, from about the 16th of November to the time of his death, says his mind was always perfectly clear; that he considered him a man of strong will and great self-possession; that he saw him on Sunday night (the night of the day before that on which the will was executed); that they two were alone at the time, he thinks; that the testator said but very little; that the testator asked him how he thought he was; that he told the testator he was very weak; that the testator said if he, the doctor, thought he was going to pass away he would like to know it, and he, the doctor, told the testator that he thought there was no immediate danger, and that the testator said he had some business to arrange— something to that effect; that he saw him again on Monday night (after the will had been executed), and he seemed rather more cheerful; that the testator was perfectly composed on the next day, Tuesday, and that he, the doctor, told him he thought he probably would not live long. He says, also, that on Sunday and Monday the testator's mind was clear. Mr. Williams, the witness before mentioned, says of the testator that mentally he was "very firm, rather headstrong, a man very much set in his way." Dr. Osborne, who had known him for a long time and had been his family physician for many years, attended him in the summer of 1882. His last call upon him was on the last day of June in that year. He says the testator was a very quiet,

still, persistent man—very persistent, rather hard to move, and that his mind was very clear indeed. Mrs. Brown, it may be added, says he was very firm, a man of very strong will, and that she never saw any indication of failure of his mental powers. More than all this, we have the evidence of the condition of his mind at the very time of executing the will in dispute. Mrs. Noe testifies that he gave her instructions for the will; that he called her to his bedside and said: " I will tell you what I want done. I am going to make a new will," and added, " I will leave everything to Emma [his wife], but I don't want the property squandered; it must not be sold under ten years, as the value of the property will increase." Mr. Black says the testator first mentioned the subject of the will to him; told him he had sent for him with reference to redrawing his will; that he wanted him to draw it, and had sent for him for the purpose; that he wanted another will and wanted to leave everything to his wife, with provision that the estate should not be sold under five years, and that his wife and Mr. Black should be the executors. Mr. Black told him he would see to it that the will should be drawn in compliance with his wishes. Before the will was signed, Mr. Black read it over to him slowly and carefully, clause by clause, and after he had done so asked him whether it was in compliance with his wishes or not, and he said it was. The testator took the paper which was handed to him for the purpose, and read it over himself, and after he had read it handed it back to Mr. Black and then it was signed. He told Mr. Black that he was anxious to have the will so drawn that it could not be set aside, and he asked Mr. Black if there would be any chance of setting it aside. Mr. Black told him that any will could be contested, but that there was a difference between a mere contest and a successful one. After the will had been signed and the execution of it witnessed, Mr. Black took the old will out of his pocket and said, " I suppose you want this will destroyed now? " to which the testator replied Yes, and took the old will and tore it. Mr. Muir, the lawyer who drew the will, and who was one of the witnesses to its execution, testifies as follows :

Black *v.* Foljambe.

"Mr. Black had the will; after drawing the will I handed it to him; he took it to the room with him; we went into the room and there was some little general conversation, and then Mr. Brown spoke something about the will, and asked if it was done; I told him—Mr. Black, I think, told him—that he had the will, and Mr. Brown said he would like to hear the will read; so Mr. Black read the will to him; at the conclusion of it Mr. Brown said; 'Now, does it take so much paper as that to give everything to my wife?'—something of that nature; Mr. Black told him that if he would notice I had written very loosely; that is, I write with such a large hand; Mr. Brown said that he wanted his will drawn so that everything would be left to his wife and wanted to read the will himself; Mr. Black handed him the will and he looked at it and read it over very carefully, and said he guessed that was all right."

There is no room to question the testator's capacity.

Nor does the evidence establish fraud. There is no proof of any importunity on any subject except for the appointment of Mrs. Brown as executrix. She was desirous that that change should be made. The testator had excused himself for not having appointed her in the will of June, 1882, on the ground that his business with the Humboldt company was not settled (as in fact it was not) at that time, and that therefore, in view of that matter, it seemed to him best for her that he should appoint business men alone as executors. But that business had been settled, and she wanted to be appointed executrix and told him so. He promised to do it and kept his word. The will was a natural one. He was kindly nursed by his wife. Dr. Van Wagner says he had good, careful nursing, and that his wife appeared to attend to him. There is no evidence of any but the kindest treatment of him at Mrs. Noe's house. He had no relatives nearer than sister's children. The Whitfields were related to him by marriage (the first one) only. He was affectionate towards his wife. He had shown a disposition to give her the benefit of his estate, which was not very large (it is valued at $20,000), and it appears from Mr. Black's testimony that the reason why he placed it in trust for twenty years by the will of June, 1882, was that he desired, for her protection, to secure it to her against her father. In none of his wills did he mention any of his relatives. To the Whitfields he made bequests by the will of June, and perhaps by the preceding one, but in November he intended and had determined to revoke the legacies to

two of them, Lizzie and Robert. It is not surprising to find that he had concluded, after a month's sickness, in which he had received the kind care and attention of his wife, to give all the property to her alone. The will is substantially in accordance with his former testamentary dispositions of his estate. There was therefore no reason for fraudulent imposition upon him to obtain it. In no will did he ever, so far as appears, give anything to the respondent, or any other of his collateral relations, in any way or in any contingency. Between him and the respondent there appears to have been no intercourse for years before his death.

It is insisted, however, that there is evidence of artifice and fraud in the steps taken to procure the will. The principal and material facts on this head appear to be that Mrs. Noe, who owned a farm about two miles from Madison, lived with her children in a house near it belonging to her father, Ezra Ayres, and he lived with her and looked after her farming operations for her. He also carried on business as a grocer and dealer in provisions in a house in Elm street, Newark, owned by him, and in which his wife with their other children lived. He was in the habit of going down to that place about once a week. On Sunday, the day before the will in question was drawn, the testator asked his wife if her father was going to Newark the next day. She answered Yes. He then said, " Then I will send for my will by him and get Mr. Black to come up." She then, at his request, wrote a note to Mr. Black and signed it, by his direction, with his name. That note was dated the 7th of January (Sunday), and was as follows :

" My health is so feeble that I shall not be able to come to the office at present, and perhaps never. You will please come up to Madison with Mr. Ayres, and bring with you my last will and testament."

The testator on the same day told Mr. Ayres that he wanted him to go to Newark on Monday morning and see Mr. Black, and get him to come up to Madison and bring the will. Mr. Ayres took the note on Monday morning, went to Newark and called on Mr. Black at his office. The latter agreed to go to

Black v. Foljambe.

Madison with him.   Mr. Ayres then went to his house in Elm street, and there informed his family that the testator was worse and on what errand he, Ayres, had come down.   One of his daughters suggested that a telegram be sent to Mr. Muir, requesting him to be at Mrs. Noe's at the time Mr. Ayres and Mr. Black would reach there—at noon—to attend to the drawing of the will.   Mr. Ayres thought it would be of no use to send the dispatch, but his daughter, nevertheless, sent it from Newark in the name of Mrs. Brown.   Messrs. Black and Muir reached Mrs. Noe's house at about the same time—within a few minutes of each other.   Mrs. Noe received, as she swears, instructions from the testator as to what the will should be.   She wrote them down on a piece of paper and handed them to Mr. Muir.   At the same time she showed to Messrs. Black and Muir, and handed to the latter, a draft of a will drawn by the testator antecedently to the will of June, 1882, but not signed, in which he gave all his property to his wife absolutely and at once.   Mr. Black afterwards went to the testator's room and saw him, and received from him the same instructions which Mrs. Noe had received, except that the testator told him, he says, that he desired that he real estate should not be sold in less than five years from his death.   She says he named ten years in his instructions to her.  Mrs. Brown asked the testator, after he had given his instructions for the will, whether he was not going to leave Lizzie Brown (Jones), an adopted daughter of his (but apparently not dependent on him) anything, and he said "Put her in for ten dollars, or a small amount, just so she will not make any trouble." Although the will was drawn by Mr. Muir, Mr. Black superintended it, and when it was finished dictated from a form-book to Mr. Muir the attestation clause.   When the will was taken to the testator's room to be signed, Mr. Black took it out of Mr. Muir's hands at the door and read it to the testator, and superintended the signing.   When the will was signed Mr. Ayres and his wife (who had come up from Newark with him) were present, as also were Mrs. Noe and Mrs. Brown.   It is argued that the facts above recited show fraudulent contrivance, and lead to the conclusion that the will was the result of undue influence over

16

the testator.   In the consideration of the question whether the
will is fraudulent or not, the fact that the disposition made by
the testator of his property by this will was in favor of the same
person to whom by his former wills he had given by far the
larger interest in his estate, is of very great importance.   By the
will of June, 1882, his wife was the principal beneficiary.   He
gave, indeed, to George Brown Whitfield $50 a year out of the
income until he should have attained his majority, and directed
that at the end of the twenty years, George, Robert L. and Lizzie
Whitfield should each, if living, have $500 out of the estate.
But in November he had determined to revoke the gift to two of
them ; and, had he executed the codicil, George B. Whitfield and
Mrs. Brown would have been the sole primary beneficiaries under
the will.   That the testator had determined to change his dispo-
sition of his estate is evident from what he said to Mr. Black on
the day the will under consideration was drawn.   When, in giv-
ing his testimony, Mr. Black was requested to give the words of
the conversation between him and the testator on that occasion,
he said :

"We had a talk first about his being so low; I expressed my sorrow at see-
ing him so feeble ; he said he was pretty feeble, or something of that kind,
and he then told me about wanting to have a new will drawn—that he wanted
to have things different, and he told me how he wanted it; he said he wanted
everything left to his wife, and that he wanted myself and his wife appointed
executors."

Mrs. Brown swears that the testator always told her he had
left her everything.   In fact, the evidence shows that she was
in no way dissatisfied with his disposition of his estate, or with
his existing will, except that she desired to be executrix.   This
desire seems to have been attributable to the fact that there had
been some trouble between Mrs. Noe and the executor of her
husband's will, and to avoid a like difficulty, Mrs. Brown wanted
to be an executor of her husband's will.   There was, previous
to the will of June, a will to which Mr. Black testifies, which
was equally favorable to Mrs. Brown with the latter.

There are some important facts in this transaction which are
indisputable.   The testator was desirous of altering his disposi-

tion of his property. Dr. Van Wagner says, as before stated, that on Sunday the testator asked him to let him know whether he thought he was likely to die soon. The reason appears to have been that he had some business to arrange. It is not shown that he had any business to do, except to make his will, and that, probably, was the business to which he referred. The testator sent for Mr. Black to come to him on Monday, and bring his will with him. He told Mr. Black that he had sent for him, and for that purpose. Mrs. Brown wrote a note to Mr. Black, as she says she did. The testator communicated to Mr. Black the fact that he wanted to make a new will, and " to have things different " from what they were in the then existing will, and he told him what he wanted, viz., to give his wife all his property, and to appoint Mr. Black and her, executors. He knew Mr. Muir was in the house, and what his business · there was. He knew from Mr. Black that Mr. Muir was drawing the will. The testator was anxious that the will should be so drawn and executed that it could not be successfully contested. After the will was read over to him, he requested that it be handed to him, in order that he might, himself, read it. It was done, and he read it over himself, and said he guessed it was all right. It does not appear that Lizzie Jones was mentioned in any previous will, and it does not appear that she had any claim whatever on the testator, or to his bounty.

The fact that Mrs. Brown's family were desirous that Mr. Muir should draw the will, and took measures to bring him to the house for that purpose, is of no great weight under the circumstances. This conduct on their part may have been due to meddlesome officiousness merely, or to a desire to have the will drawn by a lawyer whom they knew, so that they would be sure it would be done properly. They brought the testator's lawyer to the house with the will, which was in his possession, to attend to the business as the testator requested, and he, in fact, did so. The will that was drawn was in accordance with the testator's wishes and intentions towards his wife, as previously expressed.

It is urged that the difference between the will of June and the will in question is not only very notable, but evidence of

undue influence. The former will tied up the residue of the
estate in trust for twenty years, giving to George B. Whitfield
an annuity of $50 until his majority, and Mrs. Brown one of
$300 to the end of the twenty years, and then gave $1,500 to
the Whitfields, if living, and the rest to Mrs. Brown, if living,
with limitation over to charities. As before stated, the testator,
in November, determined to revoke the gifts to Robert L. and
Lizzie Whitfield, so that the difference between his intention in
November, and his intention in January following, was to the
disadvantage of George B. Whitfield and the charitable associa-
tions. It is not at all improbable that, during his sickness at
Mrs. Noe's house, the testator concluded that he ought to give
all his property to his wife, to the exclusion of George B. Whit-
field, and that he ought to bestow it upon her in such a way that
she could have the benefit of it at once upon his decease, and
that therefore he ought not to tie it up with a trust, and that
there was no reason to apprehend danger to her interest from the
influence of her father.

I am unable to concur in the view of the orphans court, that
the will was obtained by fraud. The decree will, therefore, be
reversed, and the will admitted to probate. Under the circum-
stances, the costs and a reasonable counsel fee in both courts
should be paid out of the estate.